IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| FOUNDATION FITNESS, LLC, *et al.*, | ) | Case No. 24-80513 |
| | ) | |
| Debtors. | ) | Hon. Thomas L. Saladino |

**OBJECTION TO MOTION OF THE DEBTORS FOR ENTRY OF ORDERS: (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF STALKING HORSE ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO STALKING HORSE AGREEMENT FOR STALKING HORSE ASSETS AND TO PROVIDE BID PROTECTIONS THEREUNDER, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES AND (E) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (II)(A) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

POWERbahn, LLC ("POWERbahn"), by and through counsel, hereby objects to the Motion of the Debtors for Entry of Orders: (I)(A) Approving Bidding Procedures for the Sale of Stalking Horse Assets, (B) Authorizing the Debtors to Enter into Stalking Horse Agreement for Stalking Horse Assets and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief (the "Sale Motion") (Docket No. 32). In support of this objection, POWERbahn states as follows:

## STATEMENT OF FACTS

**Background of the Parties**

1. Scott Radow ("Radow") is the owner of US Patent Nos. 7,608,015 and US 7,862,476 (the "Asserted Patents"). POWERbahn is the sole and exclusive licensee of the Asserted Patents.

2. POWERbahn's interest in this matter arises out of ongoing patent infringement litigation in the United States District Court for the Northern District of Georgia, Case No. 1:17-cv-02965 (the "Georgia Action"). Specifically, POWERbahn asserts that the bicycle and exercise trainer products and systems that are marketed, sold, and branded as SB20 by Foundation Fitness, LLC ("Foundation Fitness") and its subsidiary Stages Cycling, LLC ("Stages") infringe the Asserted Patents. Foundation Fitness and Stages are two of the Debtors in these bankruptcy cases.

**The Patent Litigation**

3. The Georgia Action began in 2015 when POWERbahn sued Wahoo Fitness L.L.C. ("Wahoo"), Foundation Fitness and Giant Bicycle, Inc. ("Giant Bicycle") for patent infringement of the Asserted Patents in connection with Wahoo's KICKR-branded bicycle and exercise trainer products in the United States District Court for the District of Nevada, Case No. 3:15-cv-00327 (the "Nevada Action"). The KICKR products were first sold in 2012.

4. The Nevada Action was eventually transferred to Georgia in 2017, and became the Georgia Action. On August 31, 2015, prior to transfer of the action, Giant Bicycle was dismissed from the litigation without prejudice because Giant Bicycle demonstrated that it only manufactured the accused KICKR products in Taiwan but was not responsible for the import or sale of the accused KICKR products in the United States.

5. The KICKR products were designed by Wahoo and Foundation Fitness through the assistance of Patrick Warner ("Warner") during the period of 2010-2012.

6. Warner became Senior Vice President of Product Development at Stages in January 2010, a position he held until February 2024.

7. Prior to joining Foundation Fitness and Stages in 2010, Warner had experience working with Radow and POWERbahn to build prototypes of products implementing the Asserted Patents at another company, Nautilus, Inc. Nautilus carefully considered and ultimately decided to license the Asserted Patents under an Exclusive License Agreement executed by Warner, as Senior Vice President of Product Development, on behalf of Nautilus, dated December 23, 2005.

8. At least on the basis of the above facts, POWERbahn accused Wahoo of direct infringement of the Asserted Patents in connection with the KICKR products and accused Foundation Fitness and Warner of indirect infringement for knowingly inducing Wahoo's direct infringement.

**The Introduction of the SB20 Product by Foundation and Settlement Negotiations**

9. Discovery during the Georgia Action focused on the KICKR products. Subsequently in 2020, after the close of discovery in the Georgia Action, Foundation Fitness announced its new product, the Stages SB20 smart bike, a stationary bike trainer product. The SB20 is a direct competitor to the Wahoo KICKR-branded bike trainers.

10. In 2022, POWERbahn and Wahoo began mediation and eventually settled the dispute in April 2023 on confidential terms. POWERbahn may share the terms of such settlement with the Court subject to an appropriate protective order.

11. POWERbahn also attempted to negotiate a settlement with Foundation and Warner for the Georgia Action relating to the KICKR products. However, as stated in a status report to

the court in the Georgia Action on April 5, 2023, POWERbahn had notified Foundation Fitness that new Foundation Fitness products introduced after the close of discovery (i.e., what became marketed as the SB20) were believed to be infringing. In the status report, the parties stated that they desired to achieve a full resolution of all issues between them, including the allegations concerning both the KICKR and SB20 products.

12.     For the above reasons, POWERbahn's claims against Foundation Fitness and Warner have not been dismissed and remain pending in the Georgia Action.

13.     POWERbahn's belief that the SB20 products infringe the Asserted Patents is based on currently public information in preliminary claim charts. In order to specifically determine infringement, POWERbahn's counsel and experts must review proprietary technical information, including source code of the firmware for the SB20 products, which POWERbahn and Foundation Fitness discussed between them and reported to the court in the Georgia Action in their joint status reports. Despite informing the court in the Georgia Action that both parties sought to resolve POWERbahn's patent infringement allegations, Foundation Fitness's subsequent actions demonstrated otherwise.

14.     POWERbahn offered to provide claim infringement charts to Foundation Fitness and Warner on August 2, 2023, in exchange for the necessary technical information on an "Attorneys' Eyes Only" basis. Foundation Fitness and Warner have refused to agree to such exchange.

15.     Despite Foundation Fitness' and Warner's refusal to provide such technical information for the SB20 products, POWERbahn ultimately provided preliminary claim charts based on publicly available information of the SB20 products on March 22, 2024. Foundation Fitness and Warner still refused to provide the technical information for the SB20 products.

16. On May 8, 2024, after 12 months of forestalling by Foundation Fitness and Warner, POWERbahn moved the court to reopen the Georgia Action and to amend its complaint to include allegations of infringement of the Asserted Patents directed to the SB20 products.

**Relationship Between Giant Group and Foundation Fitness**

17. In the meantime, Giant Manufacturing Co. Ltd. ("Giant Manufacturing") by and through its subsidiary AIPS Technology Co., Ltd. ("AIPS") sued Stages for $14 million in unpaid invoices in February 2024.

18. In March 2024, Warner resigned his role as Senior Vice President at Stages and became the Vice President of Product Development at Giant Manufacturing.

19. Giant Manufacturing is the parent of Giant Bicycle, which as stated above had been previously sued in the Nevada Action in connection with the KICKR products.

20. Giant Manufacturing is also the parent of SPIA Cycling, Inc. ("SPIA"), the stalking horse bidder in this action.

21. Other Stages personnel have also recently been hired by Giant Manufacturing or its subsidiaries. In particular, (1) Paddy Murray, previously Vice President of Global Sales and Marketing at Stages, was hired as Vice President of Global Sales and Marketing at Giant Manufacturing in February 2024; (2) Andy Lull, previously Product Development Director / Senior Mechanical Engineer at Stages, joined Giant Manufacturing as Principal R&D Engineer in March 2024; and (3) Eric Golesh, previously Product Development Director at Stages, became Principal Engineer at Giant Manufacturing in February 2024.

22. In announcing his move on LinkedIn, Murray stated, "I'll be spearheading the launch of a groundbreaking indoor cycling division SPIA Inc, reuniting with some of the most brilliant product and engineering minds in the bicycle and fitness industry, Pat Warner Eric Golesh

& Andy Lull." Murray's reference to "SPIA Inc" clearly means SPIA, the Stalking Horse Bidder in this action.

**The Instant Bankruptcy Cases and Sale Motion**

23. The Debtors initiated these bankruptcy cases on June 22, 2024, approximately six weeks after POWERbahn moved to reopen the Georgia Action with claims alleging infringement by the SB20 products.

24. The assets subject to the proposed sale in this action include the SB20 products, systems, software, and inventory that is owned by Foundation Fitness and Stages.

## ARGUMENT

**The Stalking Horse Assets may not be sold free and clear of POWERbahn's patent rights.**

25. The categories of Stalking Horse Assets to be sold pursuant to the Sale Motion are broad and constitute substantially all the Debtor's assets. (See Sale Motion at 2.) The Stalking Horse Assets include the Debtor's inventory of SB20 products and parts along machinery, equipment and intellectual property, including source code, needed to manufacture more SB20 bikes. (See Stalking Horse Agreement at ¶¶ 1.1, 2.1.) infringe the Asserted Patents.

26. POWERbahn believes the SB20 products proposed to be sold through the Sale and those sold prior to the Sale infringe the Asserted Patents. Using publicly available information of the SB20 products, POWERbahn has developed and provided the Debtors with preliminary claim charts, which the Debtors have ignored.

27. The Stalking Horse Agreement asserts that the Debtors have not infringed anyone's intellectual property rights and that there has not been any claim of infringement. Specifically, the Stalking Horse Agreement includes the following provision:

> **No Infringement**. The conduct of the business of Sellers, as such business has been conducted, has not infringed, diluted, misappropriated or otherwise violated, and Sellers' continued conduct of the business, which includes the sale or other distribution of its products does not infringe, dilute, misappropriate, or otherwise violate the Intellectual Property or other rights of any Person. There has been no written or, to the knowledge of Sellers, oral Claim of infringement, dilution, misappropriation, or other violation, asserted or, to the knowledge of any Seller, threatened (including in the form of offers or invitations to obtain a license) against any Seller. To the knowledge of any Seller, (i) no product currently sold by any Seller infringes any Person's Intellectual Property rights or otherwise violates or is in breach of any Material Contract; and (ii) no Person is infringing, misappropriating, or otherwise violating any Purchased Intellectual Property, and since January 1, 2023 no such Claims have been asserted or threatened in writing against any Person by any Seller.

(Stalking Horse Agreement at ¶ 4.6(c).) These representations and warranties are false both in that Debtors' business and any exploitation or sale of the Stalking Horse Assets will infringe the Asserted Patents, have infringed the Asserted Patents in the past and, further, that the Debtors are very well on notice of their infringement.

28. Inexplicably, the Stalking Horse Agreement includes a schedule that admits the Debtors' knowledge of POWERbahn's claim of infringement, but the Stalking Horse Agreement does not limit the scope of the Debtors' representations and warranties based on schedule. Schedule 4.6(c) includes the following disclosure that the Debtors' SB20 products infringe POWERbahn's patents:

> POWERbahn LLC ("Powerbahn") sued Foundation, Wahoo Fitness, LLC ("Wahoo") and Patrick Warner (collectively, with Foundation and Wahoo, the "Defendants") in 2015, alleging infringement of four Powerbahn patents by Wahoo's KICKR bicycle trainer products (collectively, "KICKR"). Foundation was named as a co-defendant because it assisted Wahoo in developing the mechanical design aspects of KICKR. Subsequently, Powerbahn agreed to dismiss certain patents from the lawsuit and the U.S. District Court for the Northern District of Georgia (where the suit was transferred) granted Foundation's and Warner's motion

>for summary judgment regarding the direct infringement claims while denying Foundation's and Warner's motion for summary judgment on the claims of induced infringement. The case was administratively closed on June 28, 2022, after the parties notified the court that they had reached an agreement in principle to resolve the litigation. In April 2023 Powerbahn and Wahoo finalized their settlement. Additionally, Powerbahn alleged that Foundation's SB20 Smart Bike may infringe on certain Powerbahn patents (the "<u>SB20-related Patents</u>"). On May 8, 2024, Powerbahn sought leave to reopen the case against Foundation for the purpose of filing an amended complaint that would include additional counts related to the SB20-related Patents (collectively, the "<u>Powerbahn Litigation</u>").

(Stalking Horse Agreement at Schedule 4.6(c).)

29. While Bankruptcy Code Section 363(f) has many laudable aspects, the scope of Section 363(f) is not unlimited. A Section 363(f) sale is not "free and clear" of claims and interests for patent infringement and similar liabilities after the asset purchaser sells infringing products or uses purchased assets in a way that infringes on third-parties' patent or similar rights after the sale. As such, potential asset purchasers available for sale by a bankruptcy estate would want to know if prior to the sale a third-party asserted that sale or use of assets subject to the sale would violate other patents.

30. The Motion and Stalking Horse Agreement broadly state that the Stalking Horse Assets will sold be free and clear of all liens, claims, interests and other encumbrances pursuant to Section 363(f). (See Sale Motion at ¶¶ 9(b)(i), 59-65; Stalking Horse Agreement at ¶ 2.1.)

31. Other courts have made clear that a Section 363(f) sale is not a free pass for post-sale patent infringement. See <u>Fujifilm Corp. v. Benun</u>, No. 05-1863 (KSH), 2008 WL 2676596 at *8 (D.N.J. June 30, 2008) (finding that Section 363 sale that was approved by bankruptcy court over patentee's objection did not terminate patentee's rights with respect to infringing products and did not prevent patentee from pursuing patent infringement claims against purchaser of assets in bankruptcy sale). Similarly, in a case considering a bankruptcy discharge, the Federal Circuit

has held that a patent holder was not barred from bringing claims for infringing acts that occurred after the bankruptcy. See Hazelquist v. Guchi Moochie Tackle Company, Inc., 437 F.3d 1178, 1181 (Fed. Cir. 2006) ("As Mr. Hazelquist is alleging that Mr. Yamaguchi engaged in infringing activity after the bankruptcy discharge, Mr. Hazelquist has a cause of action, or multiple causes of action, which arose after the bankruptcy discharge and which is not enjoined by section 524. Thus, Mr. Yamaguchi's bankruptcy discharge did not immunize him from suit for those causes of action that arose after the discharge."); see also Mickowski v. Visi-Trak Worldwide, LLC, 321 F. Supp. 2d 878, 883 (N.D. Ohio 2003) (claims for patent infringement not cut off by terms of order).

32. Consequently, it is clear that the Stalking Horse Assets cannot be "cleansed" of post-sale infringement claims through a sale under Section 363(f), and a buyer of the Stalking Horse Assets cannot be absolved of legal liability for future patent infringement through a Section 363(f) sale order or otherwise.

33. POWERbahn has the right, under the Asserted Patents, to exclude others from making, importing, selling, and offering for sale goods that come within the scope of its patents. The bankruptcy sale cannot change the exclusionary rights of POWERbahn. Thus, POWERbahn will retain its rights to pursue patent infringement claims, including equitable remedies, against any party that purchases and uses the Stalking Horse Assets in a way that infringes POWERbahn's rights.

34. So there are no surprises or disputes later and so that interested parties understand what is and what is not for sale, the Sale Notice, Sale Procedures Order, Stalking Horse Agreement and Asset Purchase Agreement should expressly state that the sale is not free and clear of liability for future infringement claims and should make POWERbahn's position clear with respect to the Stalking Horse Assets' infringement on the Asserted Patents.

**The Sale is nothing more than a veiled foreclosure that will leave the Debtors' estates administratively insolvent.**

35.  The proposed sale of substantially all these Debtors' assets is simply a veiled foreclosure that will leave the Debtors' estates administratively insolvent. The Debtor proposes a fire sale – selling its assets essentially one week after the sale procedures hearing and just one month into the case. Although the Debtors claim their paramount goal is to maximize value, (see Sale Motion at ¶ 37), there is insufficient time to market these assets and insufficient time for potentially interested parties to organize themselves, including securing financing and conducting due diligence. The sale procedures hearing is scheduled for July 15, and July 22 is the deadline for interested parties to submit Preliminary Bid Documents, which include proof of financial capacity to close. (Sale Motion at 12.) The minimum overbid will be in excess of $21.5 million,[1] (Bidding Procedures at II.c), and interested parties will be required to have their financing in order on less than one week's notice. Meanwhile, the Stalking Horse Bidder has had months to lure several key personnel away from the Debtors, conduct due diligence and organize financing. The Debtors' former key personnel, now working for the Stalking Horse, are already bragging on social media without concern. The Debtors' claim that they "fully intend to conduct a post-petition marketing and sale process" is not credible. (Sale Motion at ¶ 16.) On an unspecified date the Debtors plan to run an ad in the newspaper. (Sale Motion at 7.) And they plan to follow-up with unspecified potentially interested parties at some point. (Sale Motion at ¶ 16.) There is no broker. (Stalking Horse Agreement at ¶ 4.10.) Lastly, the Debtors' filings contain nothing beyond conclusory statements to suggest that Debtors have undertaken any pre-petition efforts to market themselves for sale in any appreciable manner. Rather, it seems that Debtors are bending to the

---

[1] The proposed break up fee and bid protections are unnecessary, chill bidding and ought not be approved.

will of the Stalking Horse and pushing a sale process on an exceedingly truncated and non-specific time.  Why else would a major component of the purchase price be the dismissal of the "Purchaser Lawsuit," a $15,000,000+ action filed in February, 2024, in the United States District Court in Oregon?  The reality is that there is no time and no interest in truly maximizing the value of these assets.[2]  The Debtors' key personnel are now at Giant Manufacturing, and the Debtors' goal is to get these assets to those key personnel and their new employer for commercialization and exploitation.

36.     Approximately $32 million is owed to the Debtors' putative secured creditor.  The Stalking Horse Bid is $20 million.  Unless there is significant bidding for these assets – unlikely under the Debtors' proposal – the estate will be well over $12 million administratively insolvent and there will be nothing for unsecured creditors.  Remarkably, in this case the Stalking Horse Assets are defined to include Estate Causes of Action, including claims under Bankruptcy Code Chapter 5.  These causes of action are often the only potential pool for a distribution to general unsecured creditors.  There is no business justification for including the Estate Causes of Action in the Stalking Horse Assets, particularly where any proceeds from the sale of the Estate Causes of Action will go only to the Debtors' putative secured creditor.

37.     While unsecured creditors are getting nothing in this proposed Sale, the question, what are they giving up, must be asked?  The answer is, a lot under the Debtors' proposal.  In an

---

[2]  Indeed, and somewhat oddly, Debtors support the truncated timeline by nakedly stating "Courts in this District and other districts routinely approve procedures similar to the proposed Bidding Procedures."  (Sale Motion at ¶ 39.)  Paragraph 39 cites no cases from Nebraska (or even the 8th Circuit), but only cases from Delaware.  A cursory review of these cases do not support Debtor's requested timeline; e.g. In re Things Remembered, Inc. involved a 50-day prepetition marketing process that, in the final weeks, led to hard-fought negotiations with three separate bidders; In re Charlotte Russe Holding, Inc. involved an extensive prepetition marketing process involving approximately 24 interested parties from which the stalking horse bidder was selected after the bidding procedures were in place; In re Maurice Sporting Goods of Delaware, Inc. involved a six month prepetition marketing process through third party brokers; and In re Golfsmith Int'l Holdings, Inc. involved an extensive prepetition marketing process involving hundreds of parties and 67 potential buyers reviewing the established data room and financial disclosures.

Article 9 foreclosure sale, the assets would pass subject to successor liability claims and fraudulent transfer claims. Courts interpreting UCC Section 9-617(a) have generally held that it does not protect the purchaser from successor liability claims. In Glynwed, Inc. v. Plastimatic, Inc., 869 F. Supp. 265 (D.N.J. 1994), the court held that the purchaser of assets at an Article 9 foreclosure sale was not insulated from successor liability claims:

> Nothing in the UCC supports [the successor's] argument that the [UCC foreclosure sale process] provides a safe harbor against successor liability claims. [The creditor] is not looking to enforce a lien on the assets that [the successor] purchased at the foreclosure sale, but is asserting a claim of successor liability. Contrary to [the successor's] assertions, this is a distinction with a difference.

Id. at 274. Similarly, in Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc., 124 F.3d 252 (1st Cir. 1997), the First Circuit concluded:

> First and foremost, existing case law overwhelmingly confirms that an intervening foreclosure sale affords an acquiring corporation no automatic exemption from successor liability. Nor has C & J cited authority supporting its position.
>
> Second, by its very nature the foreclosure process cannot preempt the successor liability inquiry. Whereas liens relate to assets (viz., collateral), the indebtedness underlying the lien appertains to a person or legal entity (viz., the debtor). Thus, although foreclosure by a senior lienor often wipes out junior-lien interests in the same collateral, it does not discharge the debtor's underlying obligation to junior lien creditors. As one might expect, therefore, UCC § 9–504 focuses exclusively on the effect a foreclosure sale has upon subordinate liens, rather than any extinguishment of the underlying indebtedness. Whereas the successor liability doctrine focuses exclusively on debt extinguishment, be the debt secured or unsecured.

Id. at 266; see also Asher v. KCS Intern., Inc., 659 So. 2d 598, 600 (Ala. 1995); G.P. Publications, Inc. v. Quebecor Printing-St. Paul, Inc., 125 N.C. App. 424, 481 S.E.2d 674, 679-80, (1997); Upholsterers' Intern. Union Pension Fund v. Artistic Furniture, 920 F.2d 1323, 1325, 1327, (7th Cir. 1990); E.E.O.C. v. SWP, Inc., 153 F. Supp. 2d 911, 924 (N.D. Ind. 2001).

38. Successor liability would not be waived in an Article 9 sale, and it ought not be waived in this proposed Sale – if the Court allows the Sale to go forward. In some cases, such as those cited by the Debtor in the Sale Motion, courts have ordered that the sale of assets is free and clear of successor liability arising from those assets. However, in each case the seller's liability already existed on the date of the sale. See In re Trans World Airlines, Inc., 322 F.3d 283 (3d Cir. 2003) (purchaser of airline may not be liable for seller's travel vouchers and employment discrimination claims because those liabilities arose from the assets sold); In re Leckie Smokeless Coal Co., 99 F.3d 573, 585 (4th Cir. 1996) (sale free and clear of certain taxes); In re Ormet, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (sale free and clear of pension liability).

39. However, the Debtor has not asserted any basis for the sale to be free and clear of future liabilities to POWERbahn. Future liabilities an asset purchaser may owe to POWERbahn could include liability for infringement of the Asserted Patents.

40. Additionally, the Stalking Horse Bidder has already hired many of the Debtors' director- and officer-level employees, and the potential liability of the Stalking Horse Bidder to POWERbahn would be based on these and other considerations, rather than any solely on assets the Stalking Horse Bidder may buy from the Debtors.

41. The Debtors propose a thinly veiled foreclosure sale, but their preferred buyer – the one their key directors and officers now work for – gets a sweetheart deal far better than an Article 9 foreclosure sale, if the Debtors get what they have proposed. The Court ought not grant the Motion as the proposed transaction is not arms-length. Doing so would leave the estate administratively insolvent and deny unsecured creditors the protections typically afforded in Article 9 sales or Section 363 sales.

**The Court ought not make a preliminary Section 363(m) "good faith" determination.**

42. Any Section 363(m) "good faith" determination should be reserved to the final sale hearing. There are significant questions about the involvement of the Stalking Horse and related entities in driving the Debtors into Chapter 11. The Stalking Horse raided the Debtors for their key personnel and now potentially their assets. If a sale process is approved, it is unclear how it will play out. Until all the facts are known, the Court cannot make a "good faith" determination under Section 363(m).

**Compliance with Local Rule 6004-1.**

43. Local Rule 6004-1 states that "[i]n a Chapter 11 case, if the debtor or trustee seeks approval to sell property of the estate under 11 U.S.C. § 363(b) before an order of confirmation is entered, and the sale encompasses all or substantially all the assets of the estate, the notice of sale must clearly and conspicuously state that fact. In addition to the information required under Fed. R. Bankr. P. 2002(c) and this Local Rule, the notice of sale must state the extent, if any, to which the proceeds of sale will be used to benefit each class of creditors, the extent of the debtor's liabilities, and the estimated net value of any of the remaining assets not subject to the proposed sale. The notice must also state the business justification to dispose of estate assets before a disclosure statement is approved or a plan confirmed."

44. While some of these required items may be touched upon in the Sale Motion, it does not appear as though the Sale Motion complies with Local Rule 6004-1. The fact that may Local Rule 6004-1 issues were left unaddressed in the Sale Motion, the truncated timeline and POWERbahn's concerns as to the connections between the Debtors and the Stalking Horse warrant consideration as to requiring an amended or supplemented sale motion.

WHEREFORE, POWERbahn respectfully requests that the Court:

1. Deny the Sale Motion;

2. Alternatively, deny the Debtors' request to sell the Stalking Horse Assets free and clear of POWERbahn's patent rights, expressly state in the Sale Notice, Sale Procedures Order, Stalking Horse Agreement and Asset Purchase Agreement that the sale is not free and clear of liability for future infringement claims and include a clear statement of POWERbahn's position with respect to the Stalking Horse Assets' infringement on the Asserted Patents;

3. Alternatively, require a robust marketing effort of sufficient duration to permit the value of the Stalking Horse Assets to be maximized;

4. Alternatively, exclude the Estate Causes of Action from the Stalking Horse Assets;

5. Alternatively, deny the Debtors' request to sell the Stalking Horse Assets free and clear of successor liability or future liability;

6. Alternatively, deny a Section 363(m) "good faith" finding with respect to the purchaser; and

7. Grant such other and further relief as is just and appropriate.

DATED: July 8, 2024

        Respectfully submitted,

        By:    /s/ Patrick R. Turner
        TURNER LEGAL GROUP, LLC
        Patrick Turner (NE Bar No. 23461)
        14707 California Street, #1
        Omaha, Nebraska 68154
        Telephone: (402) 690-3675
        pturner@turnerlegalomaha.com

        AND

        /s/ *Austin L. McMullen*
        Austin L. McMullen (Tenn. BPR #020877)
        BRADLEY ARANT BOULT CUMMINGS LLP
        1221 Broadway, Suite 2400
        Nashville, Tennessee 37203
        Phone: (615) 252-2307
        amcmullen@bradley.com

        *Attorneys for POWERbahn*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this the 8th day of July, 2024, a copy of the foregoing is being forwarded through the Court's CM/ECF electronic filing system to all parties consenting to such service in this case and by U.S. Mail and email to the following:

| | |
|---|---|
| Patrick M. Patino<br>Patino Law Office LLC<br>1901 Howard Street, Suite 311<br>Omaha, Nebraska 68132<br>patrick@highfivelegal.com | Amy Blackburn<br>United States Trustee<br>Roman L. Hruska U.S. Courthouse<br>111 S. 18th Plaza, Ste. 1148<br>Omaha, NE 68102<br>amy.b.blackburn@usdoj.gov |

        /s/ Austin L. McMullen
        Austin L. McMullen